UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CECILE BARKER,<br>300 South Pointe Drive, PH 4005<br>Miami, FL 33139 )<br><br>      Plaintiff, )<br><br>      v. )<br><br>EYAL BANAI<br>7910 Woodmont Avenue<br>Bethesda, Maryland 20814 )<br><br>JEFF DAVIS<br>7910 Woodmont Avenue<br>Bethesda, Maryland 20814 )<br><br>MISTRAL INC.<br>7910 Woodmont Avenue<br>Bethesda, Maryland 20814 )<br><br>MISTRAL SECURITY, INC.<br>7910 Woodmont Avenue<br>Bethesda, Maryland 20814 )<br><br>MISTRAL DETECTION,LTD.<br>7910 Woodmont Avenue<br>Bethesda, Maryland 20814 )<br><br>KARIL INTERNATIONAL MARKETING LTD.<br>7910 Woodmont Avenue<br>Bethesda, Maryland 20814 )<br><br>KARIL PROTECTIVE SYSTEMS<br>7910 Woodmont Avenue<br>Bethesda, Maryland 20814 )<br><br>      Defendants. ) | Civil Action No. _____ |

## COMPLAINT

Plaintiff Cecile Barker by and through his undersigned counsel, Robins, Kaplan, Miller & Ciresi L.L.P. and McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A., by way of Complaint against Defendants Eyal Banai; Jeff Davis; Mistral Inc.; Mistral Security, Inc.; Mistral Detection, Ltd.; Karil International Marketing Ltd.; and Karil Protective Systems, hereby alleges and states as follows:

## THE PARTIES

1.      Plaintiff Cecile Barker is the founder of Mistral Inc. and a fifty percent owner of the Mistral Group, a privately held group of companies consisting of: Mistral, Inc.; Mistral Security, Inc.; Mistral Detection, Ltd.; Karil International Marketing Ltd.; and Karil Protective Systems (hereinafter "Mistral," "The Mistral Group," or "the Mistral businesses"). Plaintiff's domicile and principal place of business is Miami, Florida.

2.      Upon information and belief, Defendant Eyal Banai is domiciled in Maryland, is a fifty percent owner of Mistral, and is an officer and/or director of the Mistral Group.

3.      Upon information and belief, Defendant Jeff Davis is domiciled in Maryland, and is Chief Financial Officer of the Mistral Group.

4.      Upon information and belief, Defendant Mistral Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business located at 7910 Woodmont Avenue, Bethesda, Maryland, and is a member of the Mistral Group.

5.      Upon information and belief, Defendant Mistral Security Inc. is a corporation organized under the laws of the State of Maryland with its principal place of business located at 7910 Woodmont Avenue, Bethesda, Maryland, and is a member of the Mistral Group.

- 2 -

6.     Upon information and belief, Defendant Mistral Detection, Ltd. is a corporation organized under the laws of the State of Israel with its United States principal place of business located at 7910 Woodmont Avenue, Bethesda, Maryland, and is a member of the Mistral Group.

7.     Upon information and belief, Defendant Karil International Marketing Ltd. is a corporation organized under the laws of the State of Israel with its United States principal place of business located at 7910 Woodmont Avenue, Bethesda, Maryland, and is a member of the Mistral Group.

8.     Upon information and belief, Defendant Karil Protective Systems is a corporation organized under the laws of the State of Israel with its United States principal place of business located at 7910 Woodmont Avenue, Bethesda, Maryland, and is a member of the Mistral Group.

## JURISDICTION AND VENUE

9.     This is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1332 (a)(1), the diversity jurisdiction statute.  Complete diversity of citizenship exists between all proper parties to this action.

10.     The complaint seeks equitable relief and compensatory damages believed to be in excess of the statutory minimum of Seventy-five Thousand Dollars ($75,000.00).

11.     Venue is proper in this Court under 28 U.S.C. § 1391(a)(2), (a)(3), (c), and (d).

## FACTUAL BACKGROUND

### I.     Mr. Barker Created Mistral, Granted A Fifty Percent Ownership Interest To Mr. Banai, And Retained A Fifty Percent Ownership Interest For Himself

12.     This action arises out of the intentional and unlawful conduct by Defendant Eyal Banai ("Mr. Banai") in refusing to honor the contracts he entered with Plaintiff Cecile Barker ("Mr. Barker") in which they agreed, inter alia, that Mr. Barker would be a fifty percent owner of Mistral.  Mistral is in the business of bringing industrial, defense, and security buyers, including

- 3 -

the United States Department of Defense, and suppliers together from around the world. Mistral's mission is two-fold. First, Mistral serves as a single source of turnkey solutions for buyers of standard as well as state-of-the-art industrial, defense, and security products. Simultaneously, Mistral provides project management and international marketing support to the suppliers of these items to ensure that the chain of events that must take place to bring industrial, defense, and security buyers and suppliers together from around the world happens seamlessly and successfully.

13.    This is a story of misplaced trust and betrayal that began in the early 1980s. At that time, Mr. Barker was the founder and Chief Executive Officer of OAO Corporation (OAO), a highly successful aerospace engineering and information technology systems company, headquartered in the Washington, D.C. metropolitan area. Mr. Barker met Mr. Banai while Mr. Banai was working at the Israeli Embassy in Washington, D.C. At that time, upon information and belief, Mr. Banai was an agent of the Mossad, the Israeli Intelligence Service. Mr. Banai accompanied Mr. Barker and other OAO executives on business trips to Israel to meet with Israeli firms doing business in the areas of defense and security. These trips generated new business for OAO. In fact, OAO and Mr. Barker subsequently received an award from the Israeli government for their work in promoting business between U.S. and Israeli companies. As a result, Mr. Barker and Mr. Banai formed a relationship of trust and personal friendship that would last for years, until 2010 when Mr. Banai breached that trust and betrayed his business colleague and friend.

14.    In 1988, Mr. Barker formed Mistral Inc. as a Delaware corporation affiliated with OAO to engage in the business of government procurement and contracting. Mistral Inc.'s headquarters and principal place of business was, and is, Bethesda, Maryland. Mr. Barker hired

82180738.1

Mr. Banai to run Mistral Inc. and gave him the title of President. He charged Mr. Banai not only with operational responsibilities, but also with the directive to grow the business into a profit-making operation. Mr. Barker did not require a written employment agreement, but instead placed his complete trust and confidence in Mr. Banai to carry out this mission.

15.     Mr. Barker bore a major portion of the expenses of starting up Mistral. He and Mr. Banai agreed that Mr. Barker would own fifty percent of the value of Mistral. They also agreed that Mr. Banai would own the other fifty percent in return for managing Mistral and turning Mistral into a profitable operation. Again, because of the trust and confidence he placed in Mr. Banai, Mr. Barker did not reduce this 1988 oral contract to writing.

16.     Mr. Barker became Chairman of the Board and a Director of Mistral Inc. in 1988, and never resigned those positions.

17.     In the early years, Mistral struggled and was not always profitable. To protect his investment, Mr. Barker contributed millions of dollars over the next thirteen years not only to pay the salaries of Mr. Banai and others, but also to fund other expenses of Mistral in order to make it a success. He also contributed his considerable business expertise, which was responsible for the enormous success of OAO. Mr. Barker also allowed Mr. Banai and Mistral to use Mr. Barker's and OAO's business reputations, long-standing relationships and contacts, and classified clearances to promote Mistral.

18.     Because Mr. Barker trusted Mr. Banai, he did not reduce to writing his agreement to fund, advise, and assist Mr. Banai and Mistral.

19.     In 2001, Mr. Barker sold OAO to Lockheed Martin, but excluded Mistral from the sale. As a result of the sale to Lockheed Martin, Mr. Barker paid over $15,000,000 in bonuses to all employees, including Mr. Banai. Mr. Barker was under no obligation – written or oral – to

- 5 -

pay these bonuses. Yet he did so to show his appreciation for the work performed by his employees, including Mr. Banai.

20.     In 2001, Mr. Barker was first diagnosed with prostate cancer. Nevertheless, he continued to communicate with Mr. Banai about Mistral. In fact, as late as 2010, Mr. Banai, at Mr. Barker's request, provided Mr. Barker with Mistral Inc.'s Balance Sheet and Profit and Loss Statement for 2009.

21.     Mr. Banai hid from Mr. Barker the full extent of the business successes of Mistral, despite Mr. Barker's inquiries and despite their relationship of trust as co-owners of Mistral.

22.     In 2004, at Mr. Banai's request, Mr. Barker provided him with a stock certificate indicating that Mr. Banai owned 5,000 shares of Mistral, Inc., which represented his fifty percent ownership interest in that company. Mr. Barker received a similar stock certificate evidencing his fifty percent ownership. Mr. Banai and Mr. Barker agreed to backdate the stock certificates to 2001 to predate the purchase of OAO by Lockheed Martin.

23.     In or about the years 2003-2004 and 2008-2009, Mr. Barker requested and received wire transfers of monies from Mistral amounting to approximately $500,000, which Mr. Barker considered loans. Mr. Barker and Mr. Banai never discussed a loan repayment schedule, and neither Mr. Banai nor Mistral ever demanded repayment of the loans. These loans are evidence of Mr. Barker's continuing ownership interest in the Mistral businesses.

**II.    When Mr. Barker Became Seriously Ill, Mr. Banai Proposed An Agreement to Ensure A Smooth Transition Of The Mistral Businesses In The Event Of Mr. Barker's Incapacity Or Death**

24.    In November 2004, Mr. Barker's physicians advised him that his prostate cancer had worsened and presented an extremely serious and life-threatening condition.  At that time, Mr. Barker was also suffering from chronic depression caused by his illness and family crises.

25.    Following receipt of the cancer diagnosis, in December 2004, Mr. Barker advised his friends and business colleagues, including Mr. Banai, of his life-threatening condition.

26.    In late December 2004, Mr. Banai told Mr. Barker that he wished to take steps to ensure that in the event of Mr. Barker's incapacity or death he could continue the Mistral businesses, including: (a) obtaining security clearances to do business with the Department of Defense; and (b) qualifying Mistral as a small business under the rules and regulations of the Small Business Administration.

27.    A short time later in 2005, Mr. Banai traveled to Florida where he presented Mr. Barker with two documents: (1) a stock certificate containing language purporting to transfer Mr. Barker's shares to Mistral Inc., without any reference to consideration or the date of transfer; and (2) a document titled "Action By All Of The Shareholder and Directors In Lieu Of Special Meeting Of The Board Of The Shareholders And Directors And In Lieu Of Annual Meeting For 2004," which referenced an undated resolution stating that Mr. Barker agreed to transfer his shares in return for the forgiveness of unspecified indebtedness at an unspecified time (hereinafter "the documents" or "the transfer documents").  Both documents were undated.

28.    The undated documents, which Mr. Banai prepared for Mr. Barker's signature, purported to transfer Mr. Barker's fifty percent ownership interest in Mistral Inc. to Mr. Banai. Mr. Banai induced Mr. Barker to sign the undated documents based on a contemporaneous oral

- 7 -

agreement between them that the undated documents would take effect only upon the incapacity or death of Mr. Barker.  Mr. Banai further induced Mr. Barker to sign the undated documents by including in the contemporaneous oral agreement his promise that upon Mr. Barker's death or incapacity, Mr. Banai would ensure that Mr. Barker's heirs would be cared for from the proceeds of the Mistral businesses.   Mr. Barker, who was residing in Florida, signed the undated documents based on this contemporaneous oral agreement with Mr. Banai.  The 2005 contracts between Mr. Barker and Mr. Banai were executed in Florida.

29.    In 2005, Mr. Barker was induced to sign the undated documents based on the contemporaneous oral agreement with Mr. Banai described above.  Mr. Barker understood the undated documents to mean that the transfer of his shares would take effect at the time of his incapacity or death, and that any of his debts owing to Mistral at the time of his incapacity or death would be forgiven.

### III.    Without Mr. Barker's Knowledge Or Consent, Mr. Banai Backdated The Transfer Documents In Violation Of Their Oral Agreement

30.    In 2005, Mr. Barker signed the undated documents, and returned them to Mr. Banai.  Without Mr. Barker's knowledge or consent, Mr. Banai subsequently backdated the documents to August 31, 2004 and September 1, 2004, respectively.  Mr. Banai did not provide Mr. Barker with a copy of the backdated documents.

31.    Mr. Banai's oral representations that the undated documents would become effective only upon the incapacity or death of Mr. Barker were intended to deceive and defraud him, and were made for the purpose of inducing Mr. Barker to rely on them.  Without Mr. Barker's knowledge or consent, Mr. Banai subsequently backdated the documents and failed to provide Mr. Barker with a copy of the documents in an effort to conceal his fraud.  Mr. Barker has not agreed to or ratified the dates which appear on the documents.

32.    Although the documents reference forgiveness of Mr. Barker's indebtedness to Mistral, Mr. Barker never intended that forgiveness of indebtedness would be the total consideration for relinquishing his ownership interest in Mistral.  At the time Mr. Barker signed the documents, they were undated, and did not identify the nature or the amount of the indebtedness, and are therefore ambiguous.  Mr. Barker had considerable liquid assets of his own at the time, in excess of $25,000,000 under his control – separate from the Mistral businesses – that would have enabled Mr. Barker to repay any loans if a repayment demand had been made.

33.    In 2006, Mr. Banai and his wife traveled to Florida for the express purpose of visiting Mr. Barker.  Mr. Banai and his wife had dinner with Mr. Barker where they discussed Mr. Barker's health and Mistral's present and future businesses.  This is additional evidence of Mr. Barker's ownership.

### IV.    The Conditions Of The 2005 Oral Agreement Have Not Taken Effect, And Mr. Barker Remains A Fifty Percent Owner Of The Mistral Businesses

34.    Mr. Barker did not become incapacitated and has recovered from prostate cancer. Accordingly, because the conditions of the contemporaneous oral contract of 2005 did not occur, the documents never took effect.

35.    In September 2010, following the most severe financial crisis in United States history since the Great Depression, Mr. Barker sought to monetize his fifty percent interest in Mistral, which had expanded to include the Mistral Group of Companies:  Mistral, Inc.; Mistral Security, Inc.; Mistral Detection, Ltd.; Karil International Marketing Ltd.; and Karil Protective Systems.

36.    Upon information and belief, Mistral has been involved in a substantial amount of defense procurement work between the Department of Defense and international suppliers over the past decade.  For example, upon information and belief, Mistral had a significant role in two

contracts between the Department of Defense and Oshkosh Corporation, the prime contractor, which, with modifications and add-ons, were worth more than Six Billion Dollars ($6,000,000,000). These contracts were awarded by the U.S. Army for Mine Resistant Ambush Protected (MRAP) All Terrain Vehicles for use by the U.S. fighting forces in Iraq and Afghanistan.

37.    Upon information and belief, Plasan North America – an armaments company based in Vermont and a subsidiary of Plasan Sasa, an Israeli company – was also involved in these Oshkosh contracts. Mr. Banai was President of Plasan North America at the time, but has since resigned. The value of these subcontracts to Plasan Sasa and Plasan North America was approximately One Billion Five Hundred Million Dollars ($1,500,000,000). Upon information and belief, Mistral received millions of dollars in revenues and profits from these contracts.

38.    To monetize his fifty percent interest, Mr. Barker asked Mr. Banai for financial information about Mistral, which he then planned to disclose to his creditors as a fifty percent owner. In response, Mr. Banai sent a 2009 Balance Sheet and Profit & Loss Statement for Mistral Inc. Mr. Banai's actions are evidence of Mr. Barker's continuing ownership.

39.    Mr. Barker did not disclose to his creditors the 2005 contracts with Mr. Banai to transfer ownership of Mistral in the event of his incapacity or death, mainly because the conditions of the contemporaneous oral agreement -- Mr. Barker's incapacity or death – had not occurred, and therefore the transfer documents never took effect. Thus, the only contract in effect between Mr. Barker and Mr. Banai at the time was the 1988 contract, which gave Mr. Barker a fifty percent interest in the value of the Mistral businesses.

82180738.1

### V. Mr. Banai Has Admitted Mr. Barker's Fifty Percent Ownership Of The Mistral Businesses, But Has Rejected Mr. Barker's Claim To Fifty Percent Of The Value Of The Mistral Businesses

40.     Although Mr. Banai and Mr. Davis have admitted to Mr. Barker and others that he, Mr. Barker, is a fifty percent owner of Mistral, Mr. Banai has rejected Mr. Barker's claim to fifty percent of the value of the Mistral businesses.   Mr. Banai is attempting to rely on the backdated and ambiguous transfer documents as proof that Mr. Barker relinquished his ownership interest in 2004.   Mr. Banai's actions are in direct violation of the 1988 and 2005 contracts between the parties.

41.     Upon information and belief, Mr. Davis, as Chief Financial Officer of the Mistral Group, advised and encouraged Mr. Banai to reject Mr. Barker's claim of fifty percent ownership of the value of the Mistral businesses.

42.     Mr. Banai and Mr. Davis, in their capacities as officers of Mistral, have refused to acknowledge Mr. Barker's fifty percent interest in the value of the Mistral businesses.   Mr. Banai and Mr. Davis, in their capacities as officers of Mistral, have also refused Mr. Barker access to Mistral's General Ledgers, tax returns, order books, and contracts to determine the valuation of the Mistral businesses for purposes of calculating the value of Mr. Barker's fifty percent ownership of the businesses.

43.     Mr. Banai has advised Mr. Barker that acknowledging Mr. Barker's fifty percent ownership in Mistral could subject him to severe penalties and perhaps even criminal prosecution for falsifying his claim of sole ownership of Mistral to the U.S. Government.

44.     Mr. Banai's failure to abide by the contemporaneous oral agreement of 2005 – by backdating the documents and by concealing the backdated documents from Mr. Barker –

- 11 -

indicate that he had no intention of honoring that agreement or the 1988 contract which entitles Mr. Barker to fifty percent ownership of the Mistral businesses.

## CAUSES OF ACTION

### COUNT I
**(Contract Reformation)**

45.     As and for this claim against Defendants Banai and Mistral, Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

46.     Plaintiff is a fifty percent owner of the Mistral businesses.

47.     Defendant Banai, in his capacity as a fifty percent owner of Mistral, refuses to acknowledge Plaintiff's fifty percent ownership of the Mistral businesses, and instead contends that Plaintiff signed certain documents which purportedly terminated his interest in the businesses.

48.     In 2005, Plaintiff and Defendant Banai, in his capacity as a fifty percent owner of Mistral, entered into a contemporaneous oral agreement in Florida in which the parties agreed that in the event Plaintiff became incapacitated or died, his fifty percent ownership in the Mistral businesses would be transferred to Mistral so that Defendant Banai could claim sole ownership of the Mistral businesses to prevent any disruption of the businesses.  Plaintiff was induced to sign certain undated and ambiguous documents based on this contemporaneous oral agreement between the parties, which included Defendant Banai's promise that Plaintiff's heirs would be provided for from the proceeds of the Mistral businesses.  The documents failed to reference the contemporaneous oral argreement, were undated and ambiguous, and were backdated by Defendant Banai without Plaintiff's knowledge.

49.     This failure was a unilateral mistake on the part of the Plaintiff, coupled with the inequitable conduct of Defendant Banai, in his capacity as a fifty percent owner of Mistral.  The

failure to include the contemporaneous oral agreement in the documents was based on the trust and confidence Plaintiff placed in Defendant Banai, which had developed over many years of working together in the Mistral businesses.

50.     Defendant Banai's oral statements that the documents would only take effect in the event of Plaintiff's death or incapacity were intended to deceive and defraud Plaintiff. Defendant Banai backdated the documents without Plaintiff's knowledge or consent, and concealed the backdating from Plaintiff.

51.     Under Florida law, parol evidence is admissible for the purpose of establishing a contemporaneous oral agreement which induced the execution of a written contract, although it may vary, change, or reform the instrument.

52.     There is no adequate remedy of law.

53.     Plaintiff is entitled to reformation of the defective writings to reflect the true terms of the 2005 contracts that the parties actually intended; that is, the transfer documents would not take effect unless Plaintiff became incapacitated or died, and if that occurred, Defendant Banai would ensure that Plaintiff's heirs were provided for from the proceeds of the Mistral businesses.   Plaintiff never became incapacitated and did not die, and therefore the transfer of Plaintiff's fifty percent interest in Mistral did not occur.

## COUNT II
### (Breach of Reformed 2005 Contract)

54.     As and for this claim against Defendants Banai and Mistral, Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

55.     In 2005, Plaintiff and Defendant Banai, in his capacity as a fifty percent owner of Mistral, entered into contracts in Florida in which the parties agreed that in the event Plaintiff became incapacitated or died, his fifty percent ownership in the Mistral businesses would be

82180738.1

transferred to Mistral so that Defendant Banai could claim sole ownership of the Mistral businesses. Plaintiff was induced to sign certain transfer documents based on the contemporaneous oral agreement between the parties that the documents would take effect only upon Plaintiff's incapacity or death, and that Plaintiff's heirs would be provided for from the proceeds of the Mistral businesses. Those agreements constitute the 2005 Reformed Contract.

56.     Plaintiff did not become incapacitated or die.

57.     Defendant Banai, in his capacity as a fifty percent owner of Mistral, materially breached the 2005 Reformed Contract with Plaintiff in numerous ways, including, without limitation, by claiming that Plaintiff relinquished his fifty percent ownership of Mistral by signing the documents, even though Plaintiff did not become incapacitated or die; by his failure to acknowledge Plaintiff as a fifty percent owner of the Mistral businesses; by his failure to apprise Plaintiff of the growth of the Mistral businesses; and by his failure to grant Plaintiff access to the General Ledgers, tax returns, order books, and contracts regarding the value of the Mistral businesses, for purposes of calculating the value of Plaintiff's fifty percent ownership interest.

58.     As a direct and proximate consequence of material breaches of the contract by Defendant Banai, in his capacity as a fifty percent owner of Mistral, Plaintiff suffered damages in an amount in excess of Seventy-five Thousand Dollars ($75,000.00).

**COUNT III**
**(Breach of 1988 Contract)**

59.     As and for this claim against Defendants Banai and Mistral, Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

60.     In 1988, Plaintiff and Defendant Banai entered into a contract in which Plaintiff and Defendant Banai each became a fifty percent owner of the Mistral businesses.

- 14 -

61.     Plaintiff faithfully and duly performed all of the terms and conditions required of the Plaintiff under the contract.

62.     Defendant Banai, in his capacity as a fifty percent owner of Mistral, materially breached the contract with Plaintiff in numerous ways, including, without limitation, his failure to recognize Plaintiff as a fifty percent owner of the Mistral businesses; his failure to apprise Plaintiff of the growth of the Mistral businesses; and his failure to grant Plaintiff access to the General Ledgers, tax returns, order books, and contracts regarding the value of the Mistral businesses, for purposes of calculating the value of Plaintiff's fifty percent ownership interest.

63.     As a direct and proximate consequence of material breaches of the contract by Defendant Banai, in his capacity as a fifty percent owner of Mistral, Plaintiff suffered damages in an amount in excess of Seventy-five Thousand Dollars ($75,000.00).

## COUNT IV
### (Breach of Fiduciary Duty)

64.     As and for this claim against Defendants Banai and Mistral, Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

65.     Plaintiff and Defendant Banai are co-owners and Directors of the Mistral businesses.  As such, Defendant Banai, in his capacity as a fifty percent owner of Mistral, owes Plaintiff a fiduciary duty.

66.     Plaintiff placed his trust and confidence in Defendant Banai by virtue of Plaintiff granting to Defendant Banai a fifty percent ownership of the Mistral businesses, as well as control over the operations and growth of the Mistral businesses.

67.     Because Defendant Banai, in his capacity as a fifty percent owner of Mistral, owes Plaintiff a fiduciary duty, he is required, and at all times material herein was required, to observe the utmost good faith and loyalty towards Plaintiff, and to avoid self-dealing.

- 15 -

68.     Defendant Banai knew, or had reason to know, that Plaintiff placed his trust and confidence in Defendant Banai, in his capacity as a fifty percent owner of Mistral, and was relying on Defendant Banai to inform Plaintiff of the progress of the Mistral businesses, and to acknowledge Plaintiff's fifty percent ownership of the businesses.

69.     Defendant Banai, in his capacity as a fifty percent owner of Mistral, breached the fiduciary duty he owed to Plaintiff in numerous ways, including, without limitation, his refusal to acknowledge Plaintiff's fifty percent ownership of the Mistral businesses; his claim of sole ownership of Mistral; his failure to inform Plaintiff of the growth of the businesses; and his refusal to grant Plaintiff access to the General Ledgers, tax returns, order books, and contracts of the businesses to allow Plaintiff to calculate the value of his fifty percent interest.

70.     As a direct and proximate consequence of the breach of fiduciary duty by Defendant Banai, in his capacity as a fifty percent owner of Mistral, Plaintiff suffered damages in an amount in excess of Seventy-five Thousand Dollars ($75,000.00).

## COUNT V
### (Conversion)

71.     As and for this claim against all Defendants, Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

72.     Plaintiff has a property interest in the Mistral businesses, amounting to fifty percent ownership of Mistral.

73.     Defendant Banai, in his capacity as a fifty percent owner of Mistral, has, without lawful justification, willfully interfered with and deprived Plaintiff of the use and possession of his interest in the Mistral businesses.

74.     As a direct and proximate result of Defendant Banai's conduct, in his capacity as fifty percent owner of Mistral, Plaintiff has suffered damages as alleged herein.

82180738.1

75.    Defendant Davis, in his capacity as Chief Financial Officer of Mistral, substantially assisted, advised, encouraged, aided, and abetted Defendant Banai's conversions. Defendant Davis had actual knowledge that Defendant Banai's conduct as described herein deprived Plaintiff of use and possession of his property interests, and Defendant Davis substantially assisted and/or encouraged Defendant Banai in the achievement of the same.

76.    As a direct and proximate consequence of Defendants' conversion of Plaintiff's property, Plaintiff suffered damages in an amount in excess of Seventy-five Thousand Dollars ($75,000.00).

## COUNT VI
### (Promissory Estoppel)

77.    As and for this claim against Defendants Banai and Mistral, Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

78.    In 1988, Defendant Banai, in his capacity as a fifty percent owner of Mistral, represented to Plaintiff that he, the Plaintiff, was also a fifty percent owner of Mistral.  In 2005, Defendant Banai, in his capacity as a fifty percent owner of Mistral, represented to Plaintiff that the Plaintiff's interest in Mistral would be transferred to Mistral – thus making Defendant Banai the sole owner of Mistral – only in the event of Plaintiff's incapacity or death.

79.    Plaintiff reasonably relied on these representations to his detriment.

80.    Plaintiff did not become incapacitated, nor did he die.

81.    In 2010, when Plaintiff requested that his fifty percent interest in Mistral be monetized and valued, Defendant Banai, in his capacity as a fifty percent owner of Mistral, declared that Plaintiff was no longer an owner of Mistral.

82.    Based on the representations of material fact by Defendant Banai, in his capacity as a fifty percent owner of Mistral, as well as the Plaintiff's detrimental reliance thereon,

82180738.1

Defendant Banai, in his capacity as a fifty percent owner of Mistral, is estopped from denying Plaintiff his fifty percent ownership interest in the Mistral businesses.

83.    As a direct and proximate consequence of the representations of Defendant Banai, in his capacity as a fifty percent owner of Mistral, Plaintiff suffered damages in an amount of excess of Seventy-five Thousand Dollars.

<u>COUNT VII</u>
**(Unjust Enrichment)**

84.    As and for this claim against all Defendants, Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

85.    Plaintiff has demanded his fifty percent interest in the Mistral businesses.

86.    Without lawful justification, Defendants have refused to provide Plaintiff with his fifty percent interest in the Mistral businesses.

87.    By refusing to provide Plaintiff with his fifty percent interest in the Mistral businesses, Defendants have conferred a benefit to themselves at the expense of Plaintiff.

88.    Defendants knowingly accepted and maintained that benefit.

89.    Defendants' retention of the benefit, despite Plaintiff's demand, is unlawful, unjust, and inequitable.

90.    Defendants have refused to pay for that benefit.  In equity and good conscience, it would be unjust for Defendants to enrich themselves at the expense of Plaintiff.

91.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiff suffered damages in an amount in excess of Seventy-five Thousand Dollars ($75,000.00).

82180738.1

## COUNT VIII
### (Fraudulent Inducement)

92.    As and for this claim against Defendants Banai and Mistral, Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

93.    Defendant Banai, in his capacity as a fifty percent owner of Mistral, made material misrepresentations of fact to Plaintiff to induce Plaintiff to sign certain documents purportedly transferring his interest in Mistral.  Specifically, Defendant Banai, in his capacity as a fifty percent owner of Mistral, represented to Plaintiff that those documents would take effect only upon Plaintiff's incapacity or death, and in that event, Plaintiff's heirs would be provided for from the proceeds of the Mistral businesses.  Defendant Banai, in his capacity as a fifty percent owner of Mistral, backdated those documents without Plaintiff's knowledge or consent, and concealed the backdated documents from Plaintiff.

94.    Defendant Banai, in his capacity as a fifty percent owner of Mistral, knew those misrepresentations to be false.

95.    Defendant Banai's misrepresentations were intended to deceive and defraud Plaintiff, and were made for the purpose of inducing Plaintiff to rely on them.

96.    Plaintiff relied on the misrepresentations of Defendant Banai to his detriment.

97.    As a consequence of the misrepresentations made by Defendant Banai in his capacity as a fifty percent owner of Mistral, Plaintiff suffered damages in an amount in excess of Seventy-five Thousand Dollars ($75,000.00).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor that:

82180738.1

1.      Plaintiff is a fifty percent owner of Mistral.

2.      Reforms the 2005 contracts between the parties to cure the defective writing, and to reflect the parties' intent that the documents transferring Plaintiff's interest in Mistral would only become effective upon Plaintiff's incapacity or death, and in that event, Plaintiff's heirs would be provided for from the proceeds of the Mistral businesses.

3.      Because Plaintiff did not become incapacitated or die, the transfer documents did not become effective, and Plaintiff did not transfer his interest in Mistral.

4.      Grants Plaintiff continued access to the General Ledgers, tax returns, order books, and contracts of the Mistral businesses necessary to calculate the value of Plaintiff's fifty percent interest in Mistral.

5.      Enjoins Defendant from denying that Plaintiff is a fifty percent owner of the Mistral businesses.

6.      Awards Plaintiff damages in excess of Seventy-five Thousand Dollars ($75,000.00).

7.      Awards Plaintiff punitive damages, his costs of suit, attorney fees, injunctive and equitable relief.

8.      Includes such further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

82180738.1

DATED: _June 14, 2011_                    **McNAMEE, HOSEA, JERNIGAN, KIM,**
                                          **GREENAN & LYNCH, P.A.**

                                          By: _____
                                               Christopher L. Hamlin, Principal

                                          6411 Ivy Lane, Suite 200
                                          Greenbelt, MD 20770
                                          Telephone: (301) 441-2420


**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _____
     Thomas L. Hamlin
     Heather M. McElroy

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015
Telephone: (612) 349-8500

**ATTORNEYS FOR PLAINTIFF**

82180738.1